### JOSE MARIA MENDEZ v. THE STATE.

*No. 7288.     Decided June 17.*

1. **Murder in the First Degree—Evidence—Charge of the Court.**—Murder in the perpetration of robbery is *per se* murder in the first degree. Under an indictment charging murder in the usual form the prosecution may prove that the homicide was committed in the perpetration of or for the purpose of perpetrating robbery, rape, arson, or burglary, and when such proof is made the charge of the court should be in accordance therewith; and in such case it is not error, but is proper, to instruct the jury that murder so committed is murder in the first degree, although the indictment does not specifically allege that the murder was so committed, but merely that it was committed with malice aforethought.

2. **Evidence—Defendant as a Witness in His Own Behalf.**—When a defendant testifies in his own behalf he stands in the same relation to the case as any other witness and is subject to the same rules as other witnesses. He may after he has testified be recalled and re-examined by the prosecution under the same rules and to the same extent as any other witness in the case.

3. **Fact Case.**—See the statement and opinion for evidence held sufficient to support a conviction for murder in the first degree.

APPEAL from the District Court of Val Verde. Tried below before Hon. W. Kelso.

The murder was committed in the unorganized county of Crockett. The evidence upon which the conviction rests is substantially as follows:

S. Perez, a witness for the State, testified that he was chief of police of the town of Garza Galon, Mexico, and as such he arrested the defendant in that town in February, 1891, and placed him in prison there. Did not then search defendant for weapons, but some time thereafter while defendant was still in prison searched him for weapons but found none on his person. Witness then searched the room in which defendant was confined and found a pistol. Witness was here shown a pistol

which he identified as the one he found in the room in which defendant was confined. No one but the defendant was confined in said room, nor had any one been confined therein except one Lazano, who had remained therein only one night, a few days before defendant was placed in said room. It appears from this witness' testimony that Lazano did not leave the pistol in the room, but that it must have been conveyed into the room by the defendant at the time he was placed therein.

Jose Ximines, a witness for the State, testified that on the morning of December 19, 1890, about 9 or 10 o clock, he went to the horse ranch where the deceased and Cy Walton were staying to get some meal. There were two houses at this ranch, one a storehouse and the other a house used for cooking, eating, and sleeping purposes. The houses were about seven yards distant from each other. He found no one on the premises and the doors of the houses were closed. He remained there about one hour when Ascension Hernandez came to the place. They then looked into the dwelling house and saw a dead man lying on the floor. Hernandez then went to the home ranch, about twelve miles distant, to tell Will Wilkins that some one had been killed at the horse ranch. Witness remained at the horse ranch while Hernandez was gone after Will Wilkins. After Will Wilkins came they went into the dwelling house and examined the dead body, and found that it was the body of Cy Walton. Will Wilkins then broke into the storehouse and there found the dead body of Frank Wilkins lying on the floor.

Ascension Hernandez, a witness for the State, testified that he went to the home ranch and informed Will Wilkins of the discovery of the dead body in the dwelling house at the horse ranch, and that Will Wilkins preceded him to the horse ranch. In other respects the testimony of this witness is the same as that of the witness Ximines.

Will Wilkins testified for the State that the horse ranch where the murder was committed is in Crockett County, Texas; that on the morning of December 19, 1890, the witness Hernandez came to the home ranch and informed him that some one had been killed at the horse ranch. Witness at once went to the horse ranch. When he reached there he found the doors of both houses closed; the door of the storehouse was locked, but the door of the dwelling house though closed was not locked. In the dwelling house he found the dead body of Cy Walton lying on the floor. The body had five or six bullet holes in the head and face and the face was badly powder burned, and in one place the skull was crushed in with bullets. There was a table about the middle of the room and a cot in one corner of the room. A chair was sitting at the table, in front of which on the table was a plate with some apple sauce on it, a cup with some tea in it, and a broken biscuit near the plate and cup. From the chair Walton had evidently fallen toward the fireplace in an opposite direction from the door. In front of the fireplace was another chair fronting the fire, and on the cot in the

corner was Frank Wilkins' hat. On the opposite side of the table from where Walton sat was a clean empty plate with a knife and fork. Witness broke open the store door, and in the store lying upon the floor he found the dead body of his brother, Frank Wilkins. The body had six bullet holes in it, some of which were in the head, and the face was powder burned. In the left hand was a small account book, and in the right hand was a small pipe and also a pencil. On the page of the account book at the place where the book was open were the following entries and dates, made in the handwriting of the deceased:

Dec. 18.—Serapio:
   Sugar.......................................30
   Coffee......................................60
   Matches....................................10
Dec. 18—Jose Maria Mendez:
   Tobacco....................................50
   Matches....................................10
   Paper......................................10
Dec. 18.—Casmo:
   Shoes—

The mark of the pencil extended across both pages of the book from the last entry. The word "shoes" shows that deceased was in the act of writing the word when shot and had not finished the entry, as the price of the shoes was not entered. Serapio and Casmo were our shepherds, and the defendant was their vacero, which means one who attends shepherds, carrying them water and provisions, moves their camp, etc. A shepherd never on any occasion leaves his flock. It was the duty of the defendant to attend to getting all things at the store for Serapio, which he always had done. Witness found in the store all the articles mentioned in the above stated entries in the account book, wrapped in separate bundles and placed upon some sacks. Cy Walton, Frank Williams, and Victoriana Martinez were the only persons that staid at the horse ranch. The latter was about 17 years of age. The camp of Serapio and defendant at the time of the murder was distant about five miles from the place of the murder. Serapio, Victoriana Martinez, and the defendant disappeared immediately after the murder, and the two former have not since been found.

At the time of the murder five horses, two pistols, some saddles and blankets and a gun, all of the value of $300, were taken from the ranch. Four of the horses were afterward recovered, two in Texas and two in Mexico. This witness identified the pistol found in defendant's prison room in Mexico as a pistol which belonged to and was in possession of Cy Walton at the time he was murdered. Other portions of this witness' testimony are not here stated because not material.

F. C. Blair and August Keiffer, witnesses for the State, identified the pistol found in defendant's prison room in Mexico as one belonging to Cy Walton at the time he was murdered.

A. Denmead, a witness for the State, testified that on the morning of December 20, 1890, he saw three men with five horses, the horses being of the same description as those taken from the place of the murder, coming from the direction of the place of the murder and going in the direction of a ford on the Rio Grande and in the direction of the Dewees ranch. He was not near enough to the men to know whether they were Americans or Mexicans. They were traveling in a hurry. Witness knew Victoriana Martinez and knew that said Martinez was well acquainted with the country, because said Martinez had formerly worked at the Dewees ranch. Witness saw the three men and horses at or near a place called Comstock, but the distance from the place of the murder to Comstock is not shown in the record. It appears however that Comstock is near the Rio Grande.

It was proved that the defendant was arrested in Garza Galon, Mexico, and was extradited. He was known there by the name of Palamontes.

Lorenza Mijias, a witness for the defendant, testified that she lived in Garza Galon, Mexico; that defendant was arrested at her house, where he had been staying about eight days; that at the time of his arrest the officers searched him and found nothing upon him but a small pocketknife. He had no pistol about him and he had no money.

Defendant, in his own behalf, testified substantially as follows: I was a vacero and working on Wilkins' ranch at the time the killing occurred. I went to Serapio's camp about 4 or 5 o'clock in the evening. I let him have my horse to go to the horse ranch to get some things, and I sent by him for some things for myself and Casmo. I staid at the camp until he returned. He was gone four or five hours. Victoriana Martinez came with him. They told me that they had killed Cy Walton and Frank Wilkins and that I must now go with them. I did not ask them anything about the killing. I was afraid of them and did not want to go with them, but was afraid not to do so. Defendant then stated about the taking of the horses and about their flight into Mexico, giving a detailed account of himself up to the time of his arrest. He stated that he had no pistol when arrested; that he knew the pistol which the witness Perez testified was found in the prison room; that it was Cy Walton's pistol, but that he, defendant, did not know how it came to be in his prison room. While I was in prison at Garza Galon I stated that Victoriana Martinez had some words with Frank Wilkins and that Frank was about to shoot him when Victoriana killed him with an ax. I told the same thing at Piedras Negras. I made these statements because Victoriana told me I must so state. I never told that we killed Wilkins and Walton before I was arrested

unless it was when I was drunk. Defendant testified that upon reaching Garza Galon he separated from his companions, they taking his horse; that for several days and nights he hid in a canebrake near the town, because he was afraid of being charged with complicity in the murder. I sent for all the things that are charged to me in Frank Wilkins' account book, and also told Serapio to get a pair of shoes for Casmo. Some time before the killing Frank Wilkins had told me that when Serapio wanted to go to the ranch I might let him go, and I had let him go once before this time to get supplies while I herded the flock.

The foregoing statement embraces all the material evidence contained in the statement of facts.

*J. G. Griner*, for appellant.

*R. H. Harrison*, Assistant Attorney-General, for the State.

DAVIDSON, JUDGE.—Appellant was convicted of the murder of Frank M. Wilkins, the death penalty assessed by the jury, and judgment was entered in accordance with the verdict.

The court charged the jury that "all murder committed with express malice is murder in the first degree, and murder committed in the perpetration of robbery is also murder of the first degree." This charge was objected to because there was "no fact in evidence warranting the submission of that issue, and the indictment not charging a murder committed in the perpetration of robbery." The indictment charged the killing upon "express malice aforethought."

While the evidence is circumstantial, yet it points conclusively to the appellant as one of the parties who killed the deceased, and it is equally apparent that the killing occurred for the purpose of robbery. "Murder in the perpetration of robbery is *per se* murder of the first degree." Gonzales v. The State, 19 Texas Ct. App, 400; Sharp v. The State, 17 Texas Ct. App., 486; Giles v. The State, 23 Texas Ct. App., 281; Willson's Crim. Stats., secs. 1033, 1039.

Under an indictment charging the killing upon express malice only it has been repeatedly held that proof was admissible to show that it was committed in the perpetration of robbery, rape, arson, or burglarly, or that the defendant's motive in perpetrating the murder was to commit either of the crimes above mentioned, and the instructions to the jury should be commensurate with the case made by the indictment and the facts in proof. Roach v. The State, 8 Texas Ct. App., 478; Reyes v. The State, 10 Texas Ct. App., 1; Sharp v. The State, 17 Texas Ct. App., 486; Gonzales v. The State, 19 Texas Ct. App., 394; Washington v. The State, 25 Texas Ct. App., 387; Giles v. The State, 23 Texas Ct. App., 281.

The evidence manifests the fact that the deceased and one Walton were murdered in a storehouse in which their business was carried on. Walton was shot in the head several times while seated at the table eating, and Wilkins was shot in the head and other parts of the body while he was making some entries in a small account book against the defendant and two other Mexicans, which entries were never completed by him. Wilkins was found in the house "lying upon his back with six bullet holes in his head and body, and the flesh of his face powder burned. In his left hand was a small account book, and in his right hand was a small pipe with the bowl resting in the palm of his hand, and also a pencil held between his thumb and fingers." In this book were the entries charging the defendant and other two Mexicans with some items they had just bought. The last item had not been fully charged and entered, but the deceased was making the entry at the time he was shot. All three of the Mexicans whose names appear of entry in the small account book were employes on the ranch of deceased and others, and were employed to assist in attending some flocks of sheep belonging to the ranch. Appellant was, a few days subsequent to the killing, arrested for this murder and placed in jail in Mexico, to which country he had escaped. After being placed in jail the pistol belonging to the deceased Wilkins was taken from him. Walton's pistol was also taken at the time of the killing. The three Mexicans disappeared the day of the killing and took five horses from the ranch with them into Mexico. The property ascertained to have been taken by these parties was valued at $300. After killing the parties their bodies were left lying on the floor of the house where killed and the door carefully locked. The evidence shows a cold-blooded killing, and in so far as the record before us tends to show said killing occurred for the purpose of robbery. There was no error in the charge as given. (Authorities already cited.)

Appellant testified in his own behalf and was cross-examined by the State. Afterward during the trial the State was permitted to recall the appellant and further examine him. Appellant objected to this recall but the objection was overruled. The objection urged was that the appellant could not be compelled to testify except "at his own instance."

Under our Bill of Rights the accused "shall not be compelled to give evidence against himself." Bill of Rights, sec. 10.

By an act of the Legislature of 1887 a defendant is permitted to testify in his own behalf. This is a privilege granted him theretofore denied by our statutes. As long as he remains off the witness stand the State can not call him to testify in his case, but when he once assumes the attitude of a witness in the case he stands in the same relation to the case as any other witness and subject to the same rules as other witnesses.

By testifying a defendant waives the protection thrown around him as such defendant by the Bill of Rights and the law and assumes the attitude, place, and liabilities attaching to him as a witness the same as other witnesses. Quintana v. The State, 29 Texas Ct. App., 401; Whart. Crim. Ev., 9 ed., pp. 429, 430, 434, and notes thereto. In this ruling of the court there was no error.

The appellant has had, in so far as the record shows, a fair and an impartial trial. The evidence, while circumstantial, is strong and fully conclusive of appellant's guilt of the homicide. The killing was evidently a cold-blooded and cruel assassination, and manifests clearly that the deceased was shot when he was not thinking of harm or danger.

We see no reason why the judgment should be reversed, and it is therefore affirmed.

*Affirmed.*

Judges all present and concurring.