## W. R. PETTY v. THE STATE.

No. 7583.   Decided April 11, 1923.

**1.—Murder—Officer in Charge of Jury—Deputy Sheriff.**

Where, appellant complained that the person in charge of the jury during the trial was not such officer as was authorized to perform this duty, but the record on appeal showed that upon the hearing of defendant's motion for new trial it was shown that the person in charge of the jury was a duly authorized and qualified deputy sheriff, there is no reversible error, in the absence of a bill of exceptions showing the error of the trial judge.

**2.—Same—Reopening Case—Recall of Witness—Cross-Examination.**

It is expressly provided by Article 718, C. C. P., that the court is authorized to permit testimony to be introduced at any time before argument of the cause is concluded if it appears necessary in the due administration of justice, and in the absence of abuse of d'scretion of the trial court, there is no error in the instant case in recalling the defendant for further cross-examination.   Following Mendez v. State, 29 Texas Crim. App., 613, and other cases.

**3.—Same—Sufficiency of the Evidence.**

Where, upon trial of murder, the evidence was sufficient to support the conviction of a life sentence in the penitentiary, there is no reversible error.

Appeal from the District Court of El Paso.   Tried below before the Hon. W. D. Howe.

Appeal from a conviction of murder; penalty, life imprisonment in the penitentiary.

The opinion states the case.

No brief on file for appellant.

*R. G. Storey,* Assistant Attorney General, for the State.

HAWKINS, JUDGE.—Conviction is for the murder of H. L. Dillon, punishment being assessed at life imprisonment in the penitentiary. In his motion for new trial appellant complains that William Andress, who was in charge of the jury during the trial, was not such officer as was authorized to perform this duty. We find in the record three bills of exception relating to this matter. It is the contention of appellant that while Andress had been serving in the capacity of a deputy sheriff the Commissioners Court of El Paso County had directed the sheriff to remove certain deputies; that in obedience to said instruction he had removed Andress as a regular deputy, and that he was at the time of the trial acting not in the capacity of a deputy sheriff, but as a "jail guard." The first bill of exception recites that said Andress was at the time of the trial "acting in the capacity of a deputy sheriff and as such deputy sheriff had charge and custody of the jury in said cause, but was not a duly authorized deputy."

It would appear from this recital itself that if Andress was not an officer de jure he was a de facto officer, but it is not necessary to discuss this question. We find upon each of the three bills the following qualification from the learned trial judge;

"Upon the hearing of defendant's motion for new trial it was proved that the said William Andress had been duly appointed a deputy sheriff of El Paso County, Texas, and had filed bond as such deputy sheriff, which bond had been duly approved, and had taken the oath as deputy sheriff and received a commission as such deputy sheriff, and said commission had never been revoked, and he was at the time of said trial acting as a deputy sheriff of El Paso County, Texas, and baliff of this court."

It appears from said qualification that upon the hearing of appellant's motion for new trial evidence was introduced upon the issue of fact raised in the motion and the court's qualification reflects his finding upon the issue so presented and heard. If appellant was dissatisfied with the learned trial judge's finding upon the evidence so introduced the testimony taken upon the hearing ought to have been perpetuated either in a statement of facts or in a proper bill of exception and brought before us in order that we might determine whether the trial judge was in error in the conclusion reached by him as stated in his qualification heretofore quoted. In the absence of the facts proven upon the hearing we must assume his finding to be correct.

The only other bills of exception in the record relate to the action

of the court in permitting the State to re-open the case after both parties had closed their testimony, and recall to the stand appellant and prove by him that he sent to his wife by a mexican messenger either on the night of the homicide or the next day the following note:

"Go to the Texas and Pacific freight office and get $135. due me. Give this man $10.

(Signed) W. R. Petty."

It appears from one bill that the State had not discovered the existence of this note until after it had closed its case; that the court permitted the State to re-open the case for the purpose of introducing it. The only objection urged was that the action of the court resulted: (a) in compelling appellant to testify to matters which had not been developed upon his direct examination; (b) that such testimony was materially damaging to him. Article 718, Code of Criminal Procedure expressly authorized the court to permit testimony to be introduced at any time before argument of the cause is concluded, if it appears necessary in the due administration of justice. We find nothing in the bills relating to this matter which would indicate that the court in any way abused his discretion under authority of the article of the statute referred to. Many cases illustrative of the rule will be found cited in Volume 2, Vernon's Crim. Statutes, under said Article 718. The court committed no error in permitting the State to recall appellant for further cross-examination. Mendez v. State, 29 Texas Crim. App., 613, 16 S. W. Rep., 766; Hamilton v. State, 60 S. W. Rep., 40; Flowers v. State, 68 Texas Crim. Rep., 547, 152 S. W. Rep., 925; Barnett v. State, 76 Texas Crim. Rep., 555., 176 S. W. Rep., 585. Appellant having become a witness voluntarily he was subject to the same rules governing any other witness, except where some statute might forbid certain matters to be used against him, such as proof of his conviction on a former trial of the same case, or or his failure to testify on a former trial. There was no violation of any such inhibitions in the present instance. For collated authorities see Section 147, page 83, Branch's Ann. P. C.

During the "shopmen's strike" appellant and deceased, together with others, were employed as guards at the Texas and Pacific Railroad yards and shops in the City of El Paso. The guards were stationed at various points about the premises. Deceased Dillon's position at the time of the homicide was at the southeast corner of the shop yards at or near a water tank. Appellant's station was at the shop yard gate, some three hundred feet from the place where deceased was located. Deceased came to work on the night of the homicide in his automobile which he drove inside the shop yard and parked between his station and that of appellant at a point about one hundred and seventy five feet east of the gate where appellant was posted. Before this time appellant had been stationed at another point in the yards, but on account of having been found asleep on

duty had been changed and placed between Dillon's station and that of a man by the name of Meyers. On the night preceding the homicide appellant had reported that he had found Dillon and Meyers both asleep. So far as the record shows the parties to whom this report was made placed little credence in it, and had not communicated to Dillon the report made by appellant. A system of signals had been arranged by means of flashlights, each guard being furnished with one with instructions to flash to the men on the adjoining stations every five or ten minutes; in the event they received no answering signal they were to get in touch with the "night roundsman" and have him investigate it. The duty of the "night roundsman" was to pass from post to post conferring with the various guards, and to keep in touch with all of them and the general situation. The State introduced as a witness D. W. Cox, a special deputy United States Marshall, who at the time of the homicide was on duty at the Texas and Pacific yards to enforce obedience to a federal court injunction. The killing occurred about one o'clock on Saturday morning, August 19. On Friday evening Cox had a conversation with appellant after the latter had gone on duty, some time after six o'clock. He testified that appellant seemed to be mad and said he was expecting to have trouble before morning; "that there was some dirty s— of a b— there that he was going to get," and pointed toward deceased and said "that was one of the dirty s— of a b—; that when he got through with them he was going to Mexico and be an outlaw;" that appellant also said he had told his wife if he did not come back next morning not to be uneasy, that he would meet her in Mexico City; that if she did not get some money through a friend she could sell the stuff up there and he would meet her up in Mexico City. Appellant did not tell Cox the cause of his complaint. About one o'clock next morning a shot was heard; appellant reported to Mr. Melton, the special officer in charge, that he had killed a man, stating that it was the man under the tank; that he had received no reply to his signals for some time and had gone down to investigate what the matter was and had found deceased at his automobile; that they had gotten into an argument· that deceased undertook to get his gun and that he (appellant) had shot him in self-defense; Melton told him to check in at the office and that he (Melton) would investigate the matter. Deceased's body was found between his automobile and the water tank, about sixty feet from the tank, He had been shot in the back with five buckshot which struck him over the kidney. The evidence shows that a number of locomotive headlights had been mounted at various places in the yard and from these and the incandescent lights near the point where the body was found things at and about the body could be discerned plainly. An empty shotgun shell was picked up north of deceased's automobile. After reporting the shooting appellant, instead of check-

ing in at the office and leaving his gun as he was directed to do by the officer in charge, left the yards, taking his gun with him, went to the river and made some inquiry about crossing into Mexico. He did not cross the river but remained in hiding until some time Sunday when he surrendered to the officers. His story about the killing is that having failed to get an answer to his signal from deceased he left his station and went to investigate the matter; that he found deceased at or near his automobile, and told him he had received no answer to his signal, whereupon he claims deceased told him he was a d— liar, and undertook to draw his pistol; that appellant presented his shotgun and told deceased to take his hand out of his pocket; that deceased did take his hand out of his pocket and upon being asked by appellant what was the trouble deceased replied "you are the s— of a b— that has reported me as being asleep on duty," and said he would get his shotgun and shoot it out with him; that deceased then started toward the tank, appellant following him, and as he reached the taken he leaned over as though to pick up his gun when appellant fired. Appellant says deceased fell immediately upon the shot being fired and did not move after that time. Appellant claims he had flashed signals to deceased's post for perhaps thirty minutes prior to leaving his own station and going to investigate and had received no reply. Guards who were stationed at other points in the yard testified that their signals to deceased had been answered promptly by him, one of them testifying that he had answered a signal not longer than ten minutes before witness heard the shot, and another that he had received an answering signal from deceased about fifteen minutes prior to the time he heard the shot. The location of deceased's body at a point some sixty feet from the tank, the evidence indicating that he had fallen immediately upon being struck by the shot, is not in consonance with the defensive theory testified to by appellant. His own story is to the effect that deceased had withdrawn his hand from his pocket at appellant's order; he could not therefore have been in any danger at the time he fired from an effort on the part of deceased to draw his pistol. If deceased fell at the point where his body was found the jury were warranted in not accepting appellant's statement that deceased was reaching for a shot-gun which was afterwards found some sixty feet away under the tank leaning against one of the supporting stanchions. The conduct of appellant immediately after the shooting does not comport with the innocent actions claimed by him. He did not report to the office as directed; neither did he go with the officer in charge of the yards to the point where the killing occurred, but left the premises, and from his own testimony it is shown he contemplated flight to Mexico, although it was later abandoned. The penalty assessed in next to the severest known to our law, but we would be unauthorized to say from the record before us that it is unwarranted.

Finding no error in the record our duty is clear. It demands an affirmance of the judgment, and it is accordingly so ordered.

*Affirmed.*